IN THE UNITED STATES COURT OF FEDERAL CLAIMS
BID PROTEST

| | | |
|---|---|---|
| CONTINENTAL SERVICE GROUP, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| COLLECTION TECHNOLOGY INC., PROGRESSIVE FINANCIAL SERVICES, INC., and ALLTRAN EDUCATION, INC. | ) ) ) ) | |
| | ) | |
| Plaintiff-Intervenors, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| PIONEER CREDIT RECOVERY, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 17-449C |
| | ) | No. 17-499C |
| THE UNITED STATES, | ) | (Consolidated) |
| | ) | Chief Judge Susan G. Braden |
| Defendant, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| CBE GROUP, INC., FINANCIAL MANANGEMENT SYSTEMS, INC., GC SERVICES LIMITED PARTNERSHIP PREMIERE CREDIT OF NORTH AMERICA, LLC, VALUE RECOVERY HOLDINGS, LLC, WINDHAM PROFESSIONALS, INC., | ) ) ) ) ) ) ) ) ) | |
| | ) | |
| Defendant-Intervenors. | ) | |

**DECLARATION OF JAMES MANNING, ACTING UNDER SECRETARY**
**UNITED STATES DEPARTMENT OF EDUCATION**

I, James Manning, Acting Under Secretary of Education, United States Department of Education, make the following declaration in lieu of an affidavit, as permitted by Section 1746 of Title 28 of the United States Code. I am aware that this declaration will be filed with the United States Court of Federal Claims in connection with the bid protests filed by Continental Services Group, Inc. and Pioneer Credit Recovery, Inc., docketed as Civ. Nos. 17-449C and 17-499C; Account Control Technology, Inc., docketed as Civ. No. 17-493C; Alltran Education, Inc., docketed as Civ. No. 17-517C; Progressive Financial Services, docketed as Civ. No. 17-588C; Collection Technology, Inc., docketed as Civ. No. 17-578C; and Van Ru Credit Corporation, docketed as Civ. No. 17-633C, and any related cases or appeals. I also understand that this declaration is the legal equivalent of a statement under oath. This declaration is provided for the purpose of supporting defendant's efforts to lift an injunction imposed by the Court in these and other cases. I make this declaration to the best of my knowledge and belief, based on my personal knowledge and information made available to me in my official capacity:

1. The Office of Federal Student Aid (FSA) is a discrete management unit within the Department of Education that is subject to the direction of the Secretary in the exercise of its functions. As the Acting Under Secretary of Education, I oversee FSA, including FSA Business Operations and FSA Acquisitions. I began serving as Acting Under Secretary under Secretary of Education Betsy DeVos, after helming President Trump's transition effort at the agency. Previously, I served as a special assistant to President Ronald Reagan and later served in President George W. Bush's education department as acting head of civil rights and postsecondary education. More recently, during the end of the Bush administration and the beginning of the Obama administration, I was Acting Chief Operating Officer of FSA from October 2008 to July 2009.

2. On May 2, 2017, the Court issued a Preliminary Injunction in these and other bid protests affecting the Department's private collection agency (PCA) contracts.

3. The Court's injunction is causing continuing serious harm to hundreds of thousands of student loan borrowers who are being denied critical services and prevented from learning about and accessing significant benefits that may be available to them regarding

their loans. In addition, the injunction is causing harm to the Government, including significant loss of revenue. The injunction also harms federal contractors with valid legal contracts not at issue in the protests, including many small businesses who may have limited access to capital and other resources.

4. These losses and harms accrue every day that the injunction remains in place. The Court's injunction has seriously impaired the Department's ability to provide much-needed services to borrowers falling into default and has seriously disrupted the debt management and collections system overall, a key aspect of the federal student aid program.

5. The Court's injunction states that the Department may not transfer "work to be performed under the contract at issue in this case to other contracting vehicles to circumvent or moot this bid protest." This language broadly prohibits the Department from assigning borrower accounts needing collection services to *any* Department contract. The prohibition includes assignment to a group of small business contractors who received a competitive award in 2014 under a solicitation unrelated to the litigation at Court and who have been performing collection services for the Department since November 2015. The validity of those small business contracts is not subject to any legal challenge.

6. Since 1981, the Department has relied heavily on PCA contractors to assist in administering its debt management and collections system. That system delivers critical debt collection and related services, with direct and significant impacts on the Federal treasury and on millions of student borrowers and their families. Today, there are more than six million student loan accounts in the Department's debt management and collections system database. The Department's inventory of defaulted loans needing PCA services grows every month. In fiscal year 2016, 1.4 million borrowers had at least one new debt added to the Department's debt management and collections system database.

7. Through its PCA contractors, the Department collects payments on defaulted student loan accounts. An important part of the PCAs' work is to make contact with defaulted

borrowers and urge them to submit payment. PCAs also initiate administrative wage garnishment procedures that ensure borrowers in default meet their repayment obligations. In fact, the PCAs are the only Department contractors authorized to initiate administrative wage garnishment procedures. The collections from these efforts are a significant source of revenue for the Government. In fiscal year 2016, due in large part to the services that PCAs provide, the Government collected a total of $1.1 billion in payments from borrowers in default, $698 million of that through administrative wage garnishment.

8. In addition to handling collections, PCAs assist qualifying borrowers to resolve their default status voluntarily by making reasonable and affordable payments. The most popular such program is called loan rehabilitation. Through such rehabilitation programs, borrowers gain access to important benefits. For example, if rehabilitation is successful, the borrower is no longer in default and the Department removes the record of default from the borrower's credit reports. The loan returns to regular (non-default) servicing, at which time the borrower is eligible for all benefits associated with the loan prior to default, including deferments, and is no longer subject to additional collection costs. In most instances, rehabilitation also allows the borrower to be in a position to secure future additional private financing, such as a home mortgage loan. In fiscal year 2016, due in large part to the work of the PCAs, 353,000 borrowers completed rehabilitation programs.

9. Beginning in April 2017, as a direct result of the Court's initial temporary restraining order issued on March 29, 2017, and subsequent injunction, the Department stopped assigning borrower accounts needing collection services to any PCA. I understand that April 2017 was the first month in at least four years that the Department was prevented, for reasons other than operational considerations, from allocating borrower accounts needing PCA services.

10. The Department estimates that approximately 91,000 borrower accounts, most of them newly-defaulted, would have been assigned to PCAs in April 2017. The total dollar value

of those accounts is approximately $2.1 billion. For the month of May 2017, the Department estimates that approximately 143,000 *additional* borrower accounts, most of them newly defaulted, were available for assignment. The total dollar value of those accounts is approximately $2.5 billion.

11. However, because of the Court's injunction, none of these accounts could be allocated to the PCAs. This means that by the end of May 2017, a total of 234,000 borrowers holding accounts collectively valued at $4.6 billion, have been denied PCA services due to the Court's orders.

12. The Department estimates that the Government has already lost at least $2.4 million in collections due to the Court's action. Moreover, the PCAs that might have received those accounts, which include the eleven small businesses mentioned in paragraph five above, were denied the opportunity to administer those accounts and earn any fees or commissions as provided for such work under their contracts.

13. The harm to the Government, to PCA contractors, and to student borrowers due to the Court's injunction grows with every passing day. Based on fiscal year 2016 figures, a conservative estimate of newly defaulted accounts added to the Department's inventory *every month* would be 118,000 borrowers, with the value of those loans totaling $2.285 billion.

14. Absent the lifting of the injunction, the Government's ability to collect on the large majority of those accounts will be seriously impaired. The affected borrowers will not be contacted by PCAs and will not receive information about possible repayment plans and rehabilitation programs that may be available to them.

15. The small business PCAs will be prevented from performing any work on those accounts even though their contracts were awarded over three years ago and are not subject to any legal challenge. Similarly, two parties that have recently received award term extension

task orders, Alltran Education, Inc. and Pioneer Credit Recovery, Inc., will also be prevented from performing any work under those contracts.

16. Essentially, the Court has seriously disrupted the Government's ability to meet its obligations under Federal law to collect on student loans and assist borrowers in repaying and rehabilitating their loans. *See* 31 U.S.C. § 3711(a)(1) & 31 C.F.R. § 901.1 (requiring agencies to collect on all debts); 20 U.S.C. §§ 1078-6(a), 1087e(a)(1) & 1087dd(h) (providing student loan borrowers a statutory right to rehabilitation, among other things); 20 U.S.C. §§ 1087f & 1082(a)(3-5) (authorizing the Secretary of Education to contract for origination, servicing, and collection of loans).

17. The Court's injunction has also harmed borrowers by impacting the process of recalling accounts from expired PCA contracts. Due to the Court's order, the Department did not recall the accounts held by six PCAs whose contracts expired on April 21, 2017. As a result, some borrowers are unable to obtain certain critical services (e.g., establishing a new repayment agreement). Many of the affected borrowers are enrolled in rehabilitation programs and may be particularly impacted by any disruption in service. Already, the Department has received complaints from borrowers due to the impact of the Court's order. Further, the injunction has caused delay and disruption to the close out process for the expired contracts, raising concerns about potential increased risks to Government data and higher contract administration costs.

18. I understand that one protester alleges that the small business PCAs, mentioned in paragraph five above, have received or will receive a volume of work exceeding the maximum allowed under their contracts. That is incorrect. The small business contracts have a maximum price ceiling of $2 billion *each*. As such, the Department may assign to this group of eleven PCAs work valued at up to $22 billion in contract payments.

19. The table below sets forth up-to-date payment information for each of the small business PCAs. As shown there, every small business has received in payments only a small fraction of its contract maximum. In the aggregate, the payments made to the eleven

small business PCAs total approximately $158 million, far less than the $22 billion maximum:

| SMALL BUSINESS PCA | TASK ORDER 2 PAYMENTS | TASK ORDER 1 PAYMENTS | TOTAL CONTRACT PAYMENTS |
|---|---|---|---|
| Action Financial | $9,559,243.27 | $32,580.74 | $9,591,824.01 |
| Bass & Associates | $329,946.61 | $90,341.00 | $420,287.61 |
| Central Research, Inc. | $7,010,867.83 | $103,700.00 | $7,114,567.83 |
| Coast Professional, Inc. | $47,906,969.39 | $93,250.00 | $48,000,219.39 |
| Credit Adjustments, Inc. | $11,993,381.85 | $45,000.00 | $12,038,381.85 |
| FH Cann & Associates, Inc. | $520,232.18 | $9,980.28 | $530,212.46 |
| Immediate Credit Recovery, Inc. | $55,300,576.03 | $116,880.00 | $55,417,456.03 |
| National Credit Services, Inc. | $520,600.51 | $34,916.16 | $555,516.67 |
| National Recoveries, Inc. | $22,841,305.85 | $61,650.00 | $22,902,955.85 |
| Prof. Bureau of Collections of MD, Inc. | $524,712.62 | $109,378.85 | $634,091.47 |
| Reliant Capital Solutions, LLC. | $433,298.50 | $66,036.08 | $499,334.58 |
| | | TOTAL | $157,704,847.75 |

I declare under penalty of perjury that the foregoing is true and correct; executed this 13th day of June, 2017.

James Manning
Acting Under Secretary
United States Department of Education