# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## NOTICE OF ENTRY OF
## JUDGMENT ACCOMPANIED BY OPINION

### OPINION FILED AND JUDGMENT ENTERED: 01/12/2018

The attached opinion announcing the judgment of the court in your case was filed and judgment was entered on the date indicated above. The mandate will be issued in due course.

Information is also provided about petitions for rehearing and suggestions for rehearing en banc. The questions and answers are those frequently asked and answered by the Clerk's Office.

Each side shall bear its own costs.

Regarding exhibits and visual aids: Your attention is directed Fed. R. App. P. 34(g) which states that the clerk may destroy or dispose of the exhibits if counsel does not reclaim them within a reasonable time after the clerk gives notice to remove them. (The clerk deems a reasonable time to be 15 days from the date the final mandate is issued.)

FOR THE COURT

/s/ Peter R. Marksteiner
Peter R. Marksteiner
Clerk of Court

17-2155, 17-2156, 17-2157, 17-2158, 17-2159, 17-2160, 17-2210, 17-2212, 17-2214, 17-2215, 17-2216, 17-2221, 17-2342 - Continental Service Group Inc. v. US
United States Court of Federal Claims, Case Nos. 1:17-cv-00449-SGB, 1:17-cv-00499-SGB, 1:17-cv-00493-SGB, 1:17-cv-00517-SGB, 1:17-cv-00558-SGB, 1:17-cv-00578-SGB, 1:17-cv-00633-SGB

NOTE: This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

_____

**CONTINENTAL SERVICE GROUP, INC.,**
*Plaintiff-Appellee*

**PIONEER CREDIT RECOVERY, INC.,**
*Plaintiff-Appellant*

**COLLECTION TECHNOLOGY, INC.,**
*Intervenor-Plaintiff*

**PROGRESSIVE FINANCIAL SERVICES,INC.,**
*Intervenor-Plaintiff-Appellee*

**ALLTRAN EDUCATION, INC.,**
*Intervenor-Plaintiff-Appellant*

**v.**

**UNITED STATES,**
*Defendant-Appellant*

**CBE GROUP, INC., PREMIERE CREDIT OF NORTH AMERICA, LLC, GC SERVICES LIMITED PARTNERSHIP, FMS INVESTMENT CORP., VALUE RECOVERY HOLDINGS, LLC, WINDHAM PROFESSIONALS, INC., AUTOMATED COLLECTION SERVICES, INC.,**
*Intervenor-Defendants*

_____

2          CONTINENTAL SERVICE GROUP INC. v. UNITED STATES

**ACCOUNT CONTROL TECHNOLOGY, INC.,**
*Plaintiff*

**v.**

**UNITED STATES,**
*Defendant-Appellant*

**PREMIERE CREDIT OF NORTH AMERICA, LLC, GC SERVICES LIMITED PARTNERSHIP, FMS INVESTMENT CORP., VALUE RECOVERY HOLDINGS, LLC, CBE GROUP, INC., AUTOMATED COLLECTION SERVICES, INC., WINDHAM PROFESSIONALS, INC., TEXAS GUARANTEED STUDENT LOAN CORP.,**
*Intervenor-Defendants*

**ALLTRAN EDUCATION, INC.,**
*Intervenor-Defendant-Appellant*

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**ALLTRAN EDUCATION, INC.,**
*Plaintiff-Appellant*

**v.**

**UNITED STATES,**
*Defendant-Appellant*

**PREMIERE CREDIT OF NORTH AMERICA, LLC, GC SERVICES LIMITED PARTNERSHIP, FMS INVESTMENT CORP., CBE GROUP, INC., VALUE RECOVERY HOLDINGS, LLC, WINDHAM PROFESSIONALS, INC.,**
*Intervenor-Defendants*

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

- - - - - - - - - - - - - - - - -

**PROGRESSIVE FINANCIAL SERVICES, INC.,**
*Plaintiff-Appellee*

**PERFORMANT RECOVERY, INC., COLLECTION
TECHNOLOGY, INC., VAN RU CREDIT
CORPORATION, ALLIED INTERSTATE LLC,**
*Intervenor-Plaintiffs*

**v.**

**UNITED STATES,**
*Defendant-Appellant*

**PREMIERE CREDIT OF NORTH AMERICA, LLC,
GC SERVICES LIMITED PARTNERSHIP,**
*Intervenor-Defendants*

**ALLTRAN EDUCATION, INC.,**
*Intervenor-Defendant-Appellant*

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**COLLECTION TECHNOLOGY, INC.,**
*Plaintiff*

**PROGRESSIVE FINANCIAL SERVICES, INC.,**
*Intervenor-Plaintiff-Appellee*

**v.**

**UNITED STATES,**
*Defendant-Appellant*

**CBE GROUP, INC., PREMIERE CREDIT OF
NORTH AMERICA, LLC,**
*Intervenor-Defendants*

**ALLTRAN EDUCATION, INC.,**
*Intervenor-Defendant-Appellant*

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**VAN RU CREDIT CORPORATION,**
*Plaintiff*

**PROGRESSIVE FINANCIAL SERVICES, INC.,**
*Intervenor-Plaintiff-Appellee*

**v.**

**UNITED STATES,**
*Defendant-Appellant*

**PREMIERE CREDIT OF NORTH AMERICA, LLC,**
*Intervenor-Defendant*

**ALLTRAN EDUCATION, INC.,**
*Intervenor-Defendant-Appellant*
————————————

2017-2155, 2017-2156, 2017-2157, 2017-2158, 2017-2159,
2017-2160, 2017-2210, 2017-2212, 2017-2214, 2017-2215,
2017-2216, 2017-2221, 2017-2342
————————————

Appeals from the United States Court of Federal Claims in Nos. 1:17-cv-00449-SGB, 1:17-cv-00493-SGB, 1:17-cv-00499-SGB, 1:17-cv-00517-SGB, 1:17-cv-00558-SGB, 1:17-cv-00578-SGB, 1:17-cv-00633-SGB, Chief Judge Susan G. Braden.
————————————

Decided: January 12, 2018
————————————

ROBERT JOSEPH SNECKENBERG, Crowell & Moring, LLP, Washington, DC, argued for Alltran Education, Inc. Also represented by DANIEL RUBEN FORMAN, JAMES G. PEYSTER.

STEVEN MICHAEL MAGER, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for United States. Also represented by CHAD A. READLER, ROBERT E. KIRSCHMAN, JR., PATRICIA M. MCCARTHY, LAUREN MOORE; SHERYL L. FLOYD, Appellate Staff, Civil Division, United States Department of Justice, Washington, DC.

JONATHAN DAVID SHAFFER, Smith, Pachter, McWhorter, PLC, Vienna, VA, argued for Pioneer Credit Recovery, Inc. Also represented by MARY PAT BUCKENMEYER.

TODD JOHN CANNI, Pillsbury Winthrop Shaw Pittman LLP, Los Angeles, CA, argued for Continental Service Group, Inc. Also represented by JAMES MATTHEW CARTER, RICHARD OLIVER, AARON RALPH; MEGHAN DUNN DOHERTY, ALEXANDER BREWER GINSBERG, McLean, VA.

THOMAS ANDREW COULTER, LeClair Ryan, Richmond, VA, argued for Progressive Financial Services, Inc.

NANDAN M. JOSHI, Consumer Financial Protection Bureau, Washington, DC, for amicus curiae Consumer Financial Protection Bureau.

REBECCA ELIZABETH PEARSON, Venable LLP, Washington, DC, for amicus curiae F.H. Cann & Associates, Inc. Also represented by MITCHELL Y. MIRVISS, Baltimore, MD.

MEGAN CAREY CONNOR, Piliero Mazza PLLC, Washington, DC, for amicus curiae Coast Professional, Inc.

Also represented by PAMELA JO MAZZA, JULIA DIANE DI
VITO.

————————————

Before DYK, REYNA, and TARANTO, *Circuit Judges.*

DYK, *Circuit Judge.*

Alltran Education Inc. ("Alltran"), Pioneer Credit Re-
covery, Inc. ("Pioneer"), and the United States appeal the
Court of Federal Claims' May 31, 2017, preliminary
injunction order, which stemmed from bid protests of
student loan collection contracts awarded under Solicita-
tion No. ED-FSA-16-R-0009 ("the Solicitation").[1] Part 1 of
the order enjoins the Department of Education ("Educa-
tion") from "authorizing the purported awardees to per-
form on the contract award under Solicitation No. ED-
FSA-16-R-0009." Part 2 of those orders enjoins Education
from "transferring work to be performed under the con-
tract at issue in this case to other contracting vehicles to
circumvent or moot this bid protest." We *affirm* as to Part
1 of the orders and *reverse* as to Part 2.

BACKGROUND

Since 1981, Education has contracted with private col-
lection agencies ("PCAs") to collect and rehabilitate stu-
dent loans that have entered into default. These contracts
are of various types, including (1) small business set aside

————————————

[1]    Identical preliminary injunction orders were is-
sued in each of six cases before the Claims Court related
to the contracts awarded under the Solicitation. The
Claims Court consolidated these six cases on September
5. *See Cont'l Serv. Grp., Inc. v. United* States, No. 17-449
(Fed. Cl.), Dkt. 186 ("*Cont. Serv. Grp. I*"). For convenience,
we refer to those cases and preliminary injunctions in the
singular.

contracts, (2) unrestricted contracts awardable to large businesses, and (3) award-term extension task orders ("ATEs") awarded to PCAs demonstrating excellent or better quality performance under existing contracts after the base period and options have been exercised. This case involves bid protests challenging seven large business contracts awarded in December 2016 under the Solicitation ("the 2016 awards").

After Education made the 2016 awards, 22 disappointed offerors—including appellants Alltran and Pioneer, and appellees Continental Service Group, Inc. ("Continental") and Progressive Financial Services, Inc. ("Progressive")—filed bid protests with the United States Government Accountability Office ("GAO"). Pursuant to the Competition in Contracting Act ("CICA"), the GAO protests triggered an automatic stay of performance of the awarded contracts. *See* 31 U.S.C. § 3553(d).

On March 27, 2017, GAO issued a decision sustaining thirteen of the protests, including Progressive's, and denying four others, including Alltran's. In its decision, GAO recommended that Education take corrective action to remedy errors in the bid evaluations. But GAO decisions are not binding, and Education retained the "responsibility to fully and independently evaluate all recommendations given by the GAO." *IMS Servs., Inc. v. United States*, 33 Fed. Cl. 167, 184 (1995).

The next day, March 28, Continental withdrew its protest at GAO and filed a new protest at the Claims Court. Continental's complaint alleged that Education's consideration of Continental's proposal—and its ultimate determination that Continental was non-responsible and ineligible for award—violated the Solicitation and the Federal Acquisition Regulation. Additionally, Count VII of Continental's complaint, which sought injunctive relief, alleged that Education was "diluting" the work that would

8        CONTINENTAL SERVICE GROUP INC. v. UNITED STATES

ultimately be performed under the 2016 large business contract awards by continuing to assign accounts to the small business contractors during the pendency of the CICA stay. Continental also filed a motion requesting that the Claims Court issue a temporary restraining order ("TRO") and preliminary injunction to limit Education's authority to assign accounts during the pendency of the bid protest.

The other private parties to this appeal also filed complaints in the Claims Court. These parties had somewhat divergent interests. First, several unsuccessful offerors whose protests had been denied or dismissed by GAO (including appellants Pioneer and Alltran) filed complaints challenging various aspects of the 2016 procurement. Unlike Continental, they did not allege that Education was "diluting" the 2016 awards. Additionally, appellee Progressive, having filed a successful GAO protest, sought to restrain Education from recalling accounts that it had received under its earlier (2009) contract, that had expired on April 21. Progressive argued that any recall of accounts from the expired 2009 contract during the corrective action would be improper because, had it received a new contract while its 2009 contract was still active, accounts from its old contract would have been retained as part of its new contract. Recalling the accounts before completion of corrective action would, Progressive alleged, preclude that retention.

On March 29, 2017, the day after Continental filed its complaint, the Claims Court issued a two-part temporary restraining order ("TRO") enjoining Education from:

(1) authorizing the purported awardees to perform on the contract award under Solicitation No. ED-FSA-16-R-0009 . . . ; and

(2) transferring work to be performed under the contract at issue in this case to other contract-

> ing vehicles to circumvent or moot this bid pro-
> test . . . .

J.A. 100142. Part 2 of the order went beyond the TRO
requested by Continental and effectively barred Educa-
tion from making account placements under *any* of its
active collection contracts, including contracts issued in
2014 under a small business set aside ("small business
contracts") and award-term extension task orders issued
in 2015 to the top-performing PCAs with 2009 contracts
("2015 ATEs"), including Continental.[2] Later versions of
the order had the effect of barring account placements
under additional ATEs ("2017 ATEs") awarded to Pioneer
and Alltran on April 28 and May 1, 2017, respectively,
which followed from an opinion of this court holding that
the Claims Court had erred in dismissing protests related
to the failure to award ATEs. *Coast Prof'l, Inc. v. United
States, Fin. Mgmt. Sys., Inc.*, 828 F.3d 1349, 1357 (Fed.
Cir. 2016). Part 2 also barred Education from recalling
accounts assigned to the 2009 contracts after those con-
tracts expired on April 21.

In its March 29 TRO, the Claims Court provided a
brief analysis of the four preliminary injunction factors,
stating:

> Regarding the first factor, the court has deter-
> mined that Continental Services would be imme-
> diately and irreparably injured, if [Education]
> moved forward with performance on the contract
> at issue in this case, or otherwise transferred
> work to another contracting vehicle to circumvent
> or moot this bid protest.

---

[2]    While the order only barred transferring work "to
circumvent or moot the bid protest," all parties appear to
agree that the order effectively barred all transfers.

> Regarding the second factor, since the Government has not yet produced the Administrative Record and the parties have not had an opportunity to brief the merits of this bid protest, the court is not in a position to decide Continental Services' likelihood of success.
>
> Regarding the third factor, the public interest is served by open and fair competition in public procurement and preserving the integrity of the competitive process.
>
> Regarding the fourth factor, the balance of hardships weighs in favor of Continental Services. Courts have generally recognized that any harm to the Government caused by delay in performance is generally less significant than the harm caused to the bid protestor.

J.A. 100141–142 (internal citations omitted). The Claims Court ultimately extended the TRO twice. J.A. 100659, 101026.

On April 3, the United States notified the Claims Court that Education had voluntarily stayed performance of the 2016 awards and would continue do so pending the court's resolution of the bid protest litigation.

On May 2, the court issued a preliminary injunction to last until May 22 with the same scope as the initial TRO. The court's primary motivation appeared to be that assigning accounts under the earlier contracts would harm protestors by "diluting" the number of accounts available to be assigned pursuant to any corrective action. The court also suggested that a broad preliminary injunction would pressure Education to negotiate a resolution of the bid protests. The order's discussion of the four preliminary injunction factors largely mirrored the analysis in the initial TRO. Additionally, the court granted the gov-

ernment's motion to dismiss Count VII of Continental's complaint—which challenged Education's continued assignment of accounts under small business contracts during the pendency of the GAO protest—as a contract administration claim subject to the Contract Disputes Act ("CDA") over which the Claims Court had no bid protest jurisdiction. *See* 41 U.S.C. § 7103. The Claims Court's dismissal of Count VII is not challenged on appeal.

On May 19, the government filed a Notice of Corrective Action. In that notice, Education committed to amending the solicitation, inviting revised offers, and reevaluating all of the proposals. The government stated that it would terminate the 2016 awards for convenience, if necessary, as part of the corrective action.

At the May 22 hearing, the court indicated that the dilution argument might not support the preliminary injunction. J.A. 101875 ("[E]very month there are new accounts that come up because people are in default. So there's new work that will be coming down the road. And I think that kind of . . . offsets the concern about the dilution business. . . . So I won't . . . keep the injunction for that purpose.") The court expressed concern, however, that it would be unfair to recall accounts from the protestors whose 2009 contracts had expired in late April. Ultimately, the Claims Court continued the preliminary injunction until June 1, and on May 31, the Claims Court issued an order continuing the preliminary injunction "until the viability of the debt collection contracts at issue is resolved." J.A. 000002. In so doing, the court relied on various extra-record materials that suggested to the court a lack of harm to "student debtors and the public fisc." *Id*. It appears that the court was again motivated by the idea of "dilution." *See Cont'l Serv. Grp. I*, 2017 WL 4926842, at *11.

12      CONTINENTAL SERVICE GROUP INC. v. UNITED STATES

On June 14, 2017, the Claims Court denied the government's motions to dismiss the Continental and Pioneer complaints as moot in light of Education's decision to take corrective action.

In June, Alltran and the United States sought a stay of the preliminary injunction pending appeal. The Claims Court did not rule on those motions. Alltran and the United States then moved for a stay in this court. On July 18, we determined to "hold the motions to stay in abeyance pending the Court of Federal Claims' decision" on its own motions for stay pending appeal. *Cont'l Serv. Grp., Inc. v. United States*, No. 2017-2155 (Fed. Cir.), Dkt. 122 ("*Cont'l Serv. Grp. II*"). Following our July 18 order, however, the Claims Court took no action on the pending stay motions. On October 27, we directed the parties to "inquire of the Court of Federal Claims when a ruling on the stay motions can be expected and [to] file a status report with this court promptly thereafter setting forth that information." *Cont'l Serv. Grp. II*, Dkt. 258. The Claims Court then denied the stay motions on October 31. *Cont'l Serv. Grp. I*, 2017 WL 4926842, at *11.

On December 8, we heard oral argument in this case. Later that day, we issued an order granting appellants' request for a stay pending appeal as to Part 2 of the preliminary injunction and denying the request as to Part 1. On December 12, the Claims Court ordered Education to complete the corrective action by January 11, 2018. *Cont'l Serv. Grp. I*, Dkt. 215. We have jurisdiction over this appeal pursuant to 28 U.S.C. § 1292(c)(1).

## DISCUSSION

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). The party seeking a preliminary injunction must establish that "[1] he is likely to succeed on the merits, [2] that he is likely to suffer irrepa-

rable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Id.* at 20.

The grant or denial of a preliminary injunction is within the sound discretion of the trial court. *Mylan Institutional LLC v. Aurobindo Pharma Ltd.*, 857 F.3d 858, 865 (Fed. Cir. 2017). This court will only reverse a decision granting a preliminary injunction where the lower court "made a clear error of judgment in weighing relevant factors or exercised its discretion based upon an error of law or clearly erroneous factual findings." *Novo Nordisk of N. Am., Inc. v. Genentech, Inc.*, 77 F.3d 1364, 1367 (Fed. Cir. 1996).

### Part 1 of the Preliminary Injunction

We first consider Part 1 of the injunction, which enjoins Education from "authorizing the purported awardees to perform on the contract award under Solicitation No. ED-FSA-16-R-0009." The government argues that the Claims Court had no jurisdiction to grant injunctive relief because Education's May 19 decision to take corrective action rendered the protestors' original challenges to the 2016 awards moot. But the mere decision to take corrective action does not necessarily moot a bid protest.

The Supreme Court has recognized that a controversy does not become moot after the defendant voluntarily ceases the challenged practice unless "interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *Chapman Law Firm Co. v. Greenleaf Const. Co.*, 490 F.3d 934, 939 (Fed. Cir. 2007) (citing *County of L.A. v. Davis*, 440 U.S. 625, 631 (1979)). This is not such a case.

This case is unlike *Chapman Law Firm*, on which the government relies. There, "the Court of Federal Claims had already determined that the revised corrective action

was reasonable" and that there was "no reasonable expectation that the action would recur." *Id.* at 940. Additionally, the Claims Court's sole reason for not dismissing the case as moot had been to preserve a claim for attorney's fees—a rationale we found insufficient under Supreme Court precedent, *id.* at 939. Here, we have no sufficient basis to conclude what was undisputed in *Chapman*: that "there clearly is no reasonable expectation that the alleged violation will recur" and that "interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *Id.* at 940 (internal quotation marks omitted).

The United States and Alltran also argue that the Claims Court did not make sufficient findings to support Part 1. We do not think that the abbreviated nature of the findings justifies setting aside the preliminary injunction in the circumstances of this case—particularly given that GAO identified problems with the procurement that resulted in the 2016 awards, the government conceded the need to take corrective action, and the government itself suspended implementation of the 2016 awards but did not terminate them**.** We affirm Part 1 of the preliminary injunction.

### Part 2 of the Preliminary Injunction

Part 2 of the preliminary injunction bars Education from "transferring work to be performed under the contract at issue in this case to other contracting vehicles to circumvent or moot this bid protest." This prevented Education from assigning new accounts under *any* of its valid contracts—including the small business contracts, the 2015 ATEs, and the 2017 ATEs.[3] It also barred Edu-

---

3   On May 22, 2017, Continental filed a second complaint at the Court of Federal Claims protesting the award of 2017 ATEs to Alltran and Pioneer. On December

cation from recalling accounts from the 2009 contracts after those contracts expired on April 21, 2017.

"The function of preliminary injunctive relief is to preserve the status quo pending a determination of the action on the merits." *Litton Sys., Inc. v. Sundstrand Corp.*, 750 F.2d 952, 961 (Fed. Cir. 1984); *see also* 11A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2948 (3d ed. 1998) ("It often has been observed that the purpose of the preliminary injunction is the preservation of the status quo and that an injunction may not issue if it would disturb the status quo."). The Claims Court, citing *Litton*, characterizes Part 2 of the injunction as doing just that: "preserv[ing] the status quo until the viability of the debt collection contracts at issue is resolved." J.A. 000002. As we explained in *Litton*, however, the "status quo to be preserved is that state of affairs existing immediately before the filing of the litigation, the last uncontested status which preceded the pending controversy." 750 F.2d at 961. When this litigation began, Education was free to assign accounts to any of its valid contracts and to recall accounts from contractors with expired contracts. Part 2 appears to alter, not preserve, this pre-litigation status quo. Part 2 mandated a complete cessation of account assignment and recall. In so doing, it impeded Education's ability to fulfill its statutory obligations to collect on student loans and to assist borrowers in repaying and rehabilitating loans.

Continental nonetheless argues that Part 2 of the injunction actually maintains the status quo by preventing Education from assigning accounts to other valid con-

---

4, 2017, the Claims Court entered a judgment dismissing Continental's suit for lack of standing. *Cont'l Serv. Grp. V. United States*, No. 27-664, 2017 WL 5988050, at *10 (Fed. Cl. Dec. 4, 2017), *appeal docketed*, No. 18-1287 (Fed. Cir.).

tracts and thereby "diluting" the value of the protested awards. This appears to be a different justification for a preliminary injunction based not on preservation of the status quo, but rather on preservation of the Claims Court's ability to afford meaningful relief—itself a possible justification for a preliminary injunction. *See* 11A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2948 (3d ed. 1998) ("There are cases in which it is necessary to require defendant to disturb the status quo by undoing acts completed before the injunction issues, or by acting affirmatively, in order to preserve the power of the court to render a meaningful decision."). To be sure, "dilution" may be a valid concern in some contexts. If a government agency awarded a contract to build a particular building and then disappointed offerors protested that award, agency action authorizing construction of the building under a different contract might in some circumstances be interpreted as an attempt to "dilute" the value of the protested award and might support a preliminary injunction halting further performance of that work to preserve the court's ability to afford meaningful relief. But "dilution" is not a legitimate concern where, as here, the protested contracts do not entitle awardees to perform the work in question—at least in the absence of a showing that the government is acting in bad faith (*e.g.* assigning accounts for the purpose of evading the effects of corrective action).

Education's contracting environment involves multiple sets of indefinite delivery, indefinite quantity ("IDIQ") contracts all servicing the same large and continually expanding pool of defaulted accounts. These IDIQ contracts, including the protested 2016 awards, simply entitle a PCA to receive accounts for a certain period of time. During that time period each contractor is guaranteed a minimum volume of work—$1,000 worth under the protested awards—but Education is otherwise entitled to

assign work (or not) as it wishes. The record is clear that Education does not "reserve pools of accounts for a particular contractor or set of contracts" and that "there is no work 'designated' for any of the multiple [IDIQ] contracts performing student loan account collection work." J.A. 100170-100171 (Queen-Harper Decl., ¶¶ 9, 11.). Moreover, student loan borrowers continue to default at alarming rates (over 100,000 defaults each month according to Education estimates and historical data), so the pool of collections work is continuously expanding.

In this context, the government's decision to take corrective action cannot in and of itself justify Part 2 of the injunction: the period of time that the future awardees will have to receive accounts is not diminished by allowing other contractors to receive accounts while this protest is pending, and no one suggests that, absent an injunction, Education could not meet its obligation to provide $1,000 of work to the eventual awardees. Put differently, a preliminary injunction does not maintain the status quo or affect the court's ability to afford meaningful relief by stockpiling work that movants had no right to perform in the first place. *See Atlas Powder Co. v. Ireco Chems.*, 773 F.2d 1230, 1232 (Fed. Cir. 1985).

Significantly also, there is no evidence that Education has done anything in bad faith with the purpose of "diluting" the protested awards. Continental's dilution theory turns on the idea that Education impermissibly "siphoned off" work that would have gone to the 2016 awardees by continuing to assign accounts to small business contracts during the pendency of the GAO bid protest but before the Claims Court's TRO issued. Continental argues that doing so "diluted" the 2016 awards and "undermined" the CICA stay—and that "[Education's] history of ignoring the CICA stay evidenced a need for the [Claims Court] to enjoin [Education] from further siphoning the accounts that were destined for the protested contracts." Continen-

tal Br. 13. But, as discussed, the protested contracts did not entitle the eventual awardees to any additional accounts. Moreover, Education's behavior in no way undermined CICA, which prohibits putative awardees from receiving work under protested awards but does not require agencies to stay performance of other, lawful contracts. *See* 31 U.S.C. § 3553(d). And, as the government had an interest in continuing to service defaulted accounts, the mere fact that Education continued to assign accounts to small businesses during the GAO protest is not evidence of bad faith.

Finally, in terms of the balance of hardships, we find that the preliminary injunction interferes with Education's interest (indeed, its statutory obligation) to collect on defaulted student loans and to assist delinquent borrowers in repaying and rehabilitating their loans. *See* 20 U.S.C. § 1078-6(a); 31 U.S.C. § 3711(a)(1); 31 C.F.R. § 901.1. It inflicts injury on PCAs with existing contracts and borrowers in default as well. Declarations before the Claims Court made clear that, by the end of June, the United States would lose over $2.4 million in collections, and over a quarter million borrowers in default would be denied PCA services. United States Br. 56. The scale of that loss has only multiplied in the months since, as borrowers continue to default on their loans, and Education remains unable to assign new collections work.

Setting aside the dilution theory, Progressive argues that Part 2 is still valid insofar as it prevents Education from recalling accounts from Progressive's expired 2009 contract. This account recall, the court explained in its May 22 order, would "appear unfair" because "but-for [Education's] alleged errors during the procurement process, Progressive . . . might have received contracts on December 9, 2016, under which they could continue to service their prior accounts."   J.A. 000108. This entire theory of harm is speculative, as it is far from clear that

Progressive would have received an award in December absent errors; that Progressive would eventually receive an award as part of the corrective action; or that, if Progressive did receive an award, it could retain its accounts. Any claimed unfairness relies on the notion that, had Progressive received a new contract while the old one was still active, it would have been entitled to retain its old accounts. That is not the case. The disputed 2016 contracts, like the 2009 contracts before them, use permissive language that allows Education to transfer accounts to a new contract, but does not entitle PCAs to retain accounts when their old contracts expire. And, again, there is no evidence that the government acted in bad faith.

The only other rationale for Part 2—one repeatedly expressed by the Claims Court—is that a broad injunction would force Education to negotiate or spur the agency to quickly complete corrective action. *See* J.A. 101416 ("The Court: [A]ll I can do in this bid protest is . . . enjoin things to try to get enough people in pain to get a resolution."). But a preliminary injunction may not be used to disadvantage the government's legitimate use of other contracts in order to encourage prompt corrective action. Rather, the appropriate mechanism to deal with Education's apparent lack of urgency would be to order the agency to complete corrective action by a date certain. We note that the Claims Court's December 12 order directs Education to complete the corrective action by January 11, 2018, but have no occasion to determine the propriety of that order. *Cont'l Serv. Grp. I*, Dkt. 215.

### CONCLUSION

For the foregoing reasons, we affirm Part 1 of the preliminary injunction but reverse Part 2.

## AFFIRMED-IN-PART, REVERSED-IN-PART, AND REMANDED.

20          CONTINENTAL SERVICE GROUP INC. v. UNITED STATES

## Costs

Each party shall bear its own costs.

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## *Questions and Answers*

### Petitions for Rehearing (Fed. Cir. R. 40)
### and
### Petitions for Hearing or Rehearing En Banc (Fed. Cir. R. 35)

---

*Q. When is a petition for rehearing appropriate?*

A. Petitions for panel rehearing are rarely successful because they most often fail to articulate sufficient grounds upon which to grant them. For example, a petition for panel rehearing should not be used to reargue issues already briefed and orally argued; if a party failed to persuade the court on an issue in the first instance, a petition for panel rehearing should not be used as an attempt to get a second "bite at the apple." This is especially so when the court has entered a judgment of affirmance without opinion under Fed. Cir. R. 36. Such dispositions are entered if the court determines the judgment of the trial court is based on findings that are not clearly erroneous, the evidence supporting the jury verdict is sufficient, the record supports the trial court's ruling, the decision of the administrative agency warrants affirmance under the appropriate standard of review, or the judgment or decision is without an error of law.

*Q. When is a petition for hearing or rehearing en banc appropriate?*

A. En banc decisions are extraordinary occurrences. To properly answer the question, one must first understand the responsibility of a three-judge merits panel of the court. The panel is charged with deciding individual appeals according to the law of the circuit as established in the court's precedential opinions. While each merits panel is empowered to enter precedential opinions, the ultimate duty of the court en banc is to set forth the law of the Federal Circuit, which merit panels are obliged to follow.

Thus, as a usual prerequisite, a merits panel of the court must have entered a precedential opinion in support of its judgment for a suggestion for rehearing en banc to be appropriate. In addition, the party seeking rehearing en banc must show that either the merits panel has failed to follow identifiable decisions of the U.S. Supreme Court or

Federal Circuit precedential opinions or that the merits panel has followed circuit precedent, which the party seeks to have overruled by the court en banc.

*Q. How frequently are petitions for rehearing granted by merits panels or petitions for rehearing en banc accepted by the court?*

A. The data regarding petitions for rehearing since 1982 shows that merits panels granted some relief in only three percent of the more than 1900 petitions filed. The relief granted usually involved only minor corrections of factual misstatements, rarely resulting in a change of outcome in the decision.

En banc petitions were accepted less frequently, in only 16 of more than 1100 requests. Historically, the court itself initiated en banc review in more than half (21 of 37) of the very few appeals decided en banc since 1982. This sua sponte, en banc review is a by-product of the court's practice of circulating every precedential panel decision to all the judges of the Federal Circuit before it is published. No count is kept of sua sponte, en banc polls that fail to carry enough judges, but one of the reasons that virtually all of the more than 1100 petitions made by the parties since 1982 have been declined is that the court itself has already implicitly approved the precedential opinions before they are filed by the merits panel.

*Q. Is it necessary to have filed either of these petitions before filing a petition for certiorari in the U.S. Supreme Court?*

A. No. All that is needed is a final judgment of the Court of Appeals. As a matter of interest, very few petitions for certiorari from Federal Circuit decisions are granted. Since 1982, the U.S. Supreme Court has granted certiorari in only 31 appeals heard in the Federal Circuit. Almost 1000 petitions for certiorari have been filed in that period.

October 20, 2016

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## INFORMATION SHEET

## FILING A PETITION FOR A WRIT OF CERTIORARI

There is no automatic right of appeal to the Supreme Court of the United States from judgments of the Federal Circuit. You must file a petition for a writ of certiorari which the Supreme Court will grant only when there are compelling reasons. (See Rule 10 of the Rules of the Supreme Court of the United States, hereinafter called Rules.)

**Time.** The petition must be filed in the Supreme Court of the United States within 90 days of the entry of judgment in this Court or within 90 days of the denial of a timely petition for rehearing. The judgment is entered on the day the Federal Circuit issues a final decision in your case. [The time does not run from the issuance of the mandate, which has no effect on the right to petition.] (See Rule 13 of the Rules.)

**Fees.** Either the $300 docketing fee or a motion for leave to proceed in forma pauperis with an affidavit in support thereof must accompany the petition. (See Rules 38 and 39.)

**Authorized Filer.** The petition must be filed by a member of the bar of the Supreme Court of the United States or by the petitioner representing himself or herself.

**Format of a Petition.** The Rules are very specific about the order of the required information and should be consulted before you start drafting your petition. (See Rule 14.) Rules 33 and 34 should be consulted regarding type size and font, paper size, paper weight, margins, page limits, cover, etc.

**Number of Copies.** Forty copies of a petition must be filed unless the petitioner is proceeding in forma pauperis, in which case an original and ten copies of the petition for writ of certiorari and of the motion for leave to proceed in forma pauperis. (See Rule 12.)

**Where to File.** You must file your documents at the Supreme Court.

**Clerk**
**Supreme Court of the United States**
**1 First Street, NE**
**Washington, DC 20543**
**(202) 479-3000**

No documents are filed at the Federal Circuit and the Federal Circuit provides no information to the Supreme Court unless the Supreme Court asks for the information.

**Access to the Rules.** The current rules can be found in Title 28 of the United States Code Annotated and other legal publications available in many public libraries.

Revised December 16, 1999